THE PEOPLE v. LEVI HARRIS.

The mode of changing the place of trial in criminal cases.

The court have no power to dismiss an indictment on the merits, on the ground of failure of sufficient proof. It can only advise the public prosecutor not to press for a conviction, but consent to a verdict of acquittal.

The district attorney is not bound to follow the advice, though it is very unusual in this country and in England to disregard it.

The attorney-general has power of himself to enter a *nolle prosequi* on an indictment. The district attorney can do so, only with the consent of the court.

ON the complaint of some New York merchants, the defendant was indicted in the county of Chenango for forging a draft for $30,000. The indictment was removed to the Supreme Court because of an alleged prejudice in that county, and sent down to New York to be tried on the civil side of the court, that being the mode provided by law for changing the place of trial in criminal cases. (2 N. Y. Stat. at Large, 757.)

Sydney Smith had been a merchant in New York, had made a large fortune and retired from business.

He was born in Chenango county, and at an early age he and an only sister were left orphans, and destitute of the means of support. She went out to service in that vicinity, and he went to New York to seek his fortune. In process of time she married the defendant, a respectable farmer. Her brother never married, but retired from business because of his impaired health, he and his sister both inheriting a tendency to consumption. They were warmly attached to each other, though they had been separated for some years by his occupation in New York, and her residence in Chenango.

On his retiring from business he left much of his fortune

with his former partners, and determined to go abroad in the hope of improving his health. Before starting on his tour he made his will, making those partners his executors, and after devising to his sister enough to make her wealthy in the country where she lived, he gave the bulk of his estate to the children of his partners. He was gone some two years, traveling in Europe, and finding his health growing worse instead of better, he returned home.

On his return voyage he became acquainted with General Dix, who was a passenger in the same vessel, and their acquaintance became so intimate that Smith talked freely with the General of his personal affairs, and, among other things, said that he was satisfied that he had not given to his sister as much of his property as he ought to have done, and he intended, when he reached New York, to alter his will, and increase the bequest to her. He also expressed his conviction that he should live only a little while.

On his arrival he wrote to his sister from New York, informing her of his return, and that he intended to make her a visit with a friend, and for that purpose he had purchased and sent to her some furniture and family stores.

This letter was handed to her at her own house, in the absence of her husband, by the postmaster, who, with his wife, called upon her. She opened and read the letter in their presence, but her education being very imperfect, she spelled it out with difficulty, and communicated to them its contents so far as concerned his return home and his proposed visit to her. They did not read it, but they saw that three pages were written on, and they saw, too, that she did not then read the whole of it. She was a good deal excited at receiving the letter, so much so as to attract the attention of her servant girl, who was also present. She put the letter away in a drawer of her bureau, and immediately, and for two or three days afterward, busied herself in preparing for the reception of her brother.

While thus awaiting him she received a letter from New York informing her that he had been attacked with bleeding

at the lungs. She at once repaired to the city, where in a few days he died, and she returned home, taking his remains with her.

In the course of the ensuing year some disputes arose between her and the executors of her brother's will, as to the settlement of his estate, and in about eighteen months after his death, when she and her counsel and advisers were preparing for the trial of some suit, she was requested to produce all his letters to her, in order to ascertain his intentions. She hunted them up from various places, and among them was the letter she had received from him on his arrival from Europe. It was read, and then for the first time read through, and then, too, for the first time, there was found on the bottom of its third page a draft of her brother on his former partners for $30,000, and in the letter an explanation of the reasons why he had sent it, namely, for the purpose avowed by him to General Dix, of increasing the bequest to his sister.

Her husband then proceeded to New York to present the draft, and took with him two of the persons who were present when the letter was thus read through and the draft was discovered.

Just as they were starting, and putting all their baggage into one traveling bag, one of them suggested the danger they would be in of being robbed in that large city, with which they were not much acquainted, and therefore the draft was torn off from the letter and put into the defendant's pocketbook, which he carried about his person, and the letter was put into the traveling bag.

The party arrived in New York by the steamboat early in the morning, and went to the nearest hotel, where, after entering their names on the register, they went to breakfast, leaving their traveling bag in the office. On their return from breakfast they found their bag was gone — it had been stolen, and they never recovered it, so that when they called on Smith's executors, they had nothing to present but the draft.

The circumstances under which it was presented excited suspicion. The handwriting to the draft was like Smith's, but

still different from his ordinary writing, and the absence of the letter was so unsatisfactorily accounted for, that the executors pronounced the whole thing a fraud and refused to pay the draft. They were persuaded the draft was a forgery, and had him indicted for it.

These facts were all proved on the trial, and much stress was laid upon the difference in the handwriting, which, however, it was claimed could be accounted for by the state of his health, and upon the absence of the letter and all evidence of its contents.

But the defendant introduced as a witness the servant girl who was present when the defendant's wife received and read the letter, and saw where she put it. So, her curiosity being excited to learn what it was that had caused so much emotion, she went to the bureau, after Mrs. Harris had started for New York, and read the letter. But she had not disclosed the fact of her having done so, to any one but an elder sister, who told her how wrong she had done to read other people's letters, and warned her never to let it be known.

Accordingly the two sisters kept it as a secret for the whole time, until they heard it talked of in the neighborhood how unfortunate it was that no one could testify to having seen the draft in the letter at or about the time it had been received, so as to remove the suspicion that it had been fabricated afterward, and then she made it known that she had read the letter and had seen that it had the draft then annexed to it, and that it gave the reasons for sending it.

The defendant's previous good character, and his inability to perpetrate such a forgery, were proved.

*J. McKeon* (district attorney) and *C. O'Conor* appeared for the prosecution.

*J. A. Spencer*, for defendant.

At the close of the testimony the circuit judge expressed his opinion that the prosecution ought not to press for a con-

The People v. Levi Harris.

viction, because their whole case depended solely upon proof of opinion as to handwriting, which, even if there was nothing else in the case, was not strong enough to warrant a conviction, and was, besides, more than overcome by the other testimony in the case.

*O'Conor*, who had been employed as counsel by the executors, and not by the State, insisted upon his right to go to the jury, and persuaded the district attorney to refuse to listen to the suggestion of the court, and claimed that the court had not the authority to take the case from the jury.

*The Circuit Judge* conceded that on the trial of an indictment the court had not the power, as in civil cases, to nonsuit the plaintiff, and that if the public prosecutor insisted upon going to the jury he must do so.

*The District Attorney* insisted, and the counsel summed up the case.

*The Circuit Judge* charged the jury, and began by alluding to the attempt which had been made to arrest the trial, because of what the court had regarded as satisfactory evidence of the innocence of the defendant, and to the manner in which the public prosecutor and the private counsel had treated this discharge of its duty by the court. And proceeded:

The course which I felt it to be my duty to take has been very loudly and severely arraigned. Much of the time occupied by the counsel engaged in the prosecution in addressing you, has been employed in that arraignment. So far as the assault upon these proceedings was personal in its character — so far as it was intended or calculated to wound the feelings of the presiding officer of this court, you nor I have naught to do with the matter. I hold it to be one of the most solemn duties of a judge and jury, when passing upon the rights, and perhaps the liberties, of their fellow citizens, to discard

from their view all personal considerations; and I hold, also, that a judge or jury would betray the trust which the law imposes on them, if they should stop for one moment in the administration of justice to defend themselves from any assault, however gross, or personal, or bitter it might be. They stand, therefore, in all such cases, where either passion, or prejudice, or interest, or any other motive, may induce either parties, or their counsel, to assail them, or either of them — in a position where they cannot defend themselves without sacrificing the important interests committed to their charge.

I cannot, therefore, so far as any thing in the whole progress of this matter may have looked or been intended as personally wounding to myself, stop to consider it, nor can I permit you for one moment to suffer any reflections growing out of that state of things, to enter into your consideration in determining this case. I dismiss then from my own mind, and I charge you to dismiss from yours, every consideration growing out of the occurrence and character of that assault, or the manner in which it was conducted. I ask you to confine your attention closely to the point at issue, and the question on which you and I are now called upon to pronounce our judgment.

Yet it can hardly be doubted that the remarks made in reference to those proceedings, which occupied nearly one-half of the entire addresses of counsel, were intended to have some bearing on the case itself, and to influence your verdict, and in this aspect it is proper that I should consider them. What was then done was simply this: Before the counsel commenced summing up, the presiding judge stated openly and publicly, in hearing of all the parties, the view which he had taken of this case. He made no authoritative direction in regard to it. He did not say to the jury, nor assume to himself to pronounce to the jury, that they should find a verdict one way or another. He did not assume the province of saying that this case shall be sent out of court, or the defendant shall be acquitted.

He stated his views of the case because he regarded it as a usual and ordinary mode of procedure, and because he believed it to be due the administration of justice. He did it in no authoritative manner; not as directing the public prosecutor, but simply as a matter of advice to that officer. It is true that the advice might have been given in briefer language. The judge might have expressed his opinion of the result without giving the reasons on which that opinion was founded; he might previously have had some consultation with the district attorney and his associate counsel, and asked their views. But it appears to me always that that course is decidedly the best which is most frank and open, and that that course is most liable to exception which brings the court and the public prosecutor privately together, combining against the liberty or the defense of the accused party. I have, therefore, in all instances where I have felt called on to adopt the course pursued—and it was by no means a novel proceeding with me—expressed openly and publicly, in the hearing of all parties concerned, the views which I had taken of the case, in order that, if any error existed in those views, it might be publicly corrected, and if right, in order that the parties concerned might be fully in possession of them. That was the course which was so severely arraigned. That was the course which was again and again pronounced to be unprecedented.

Now it is proper that I should show to you, gentlemen, not only that that course is precedented, but that the practice pursued has prevailed in this country since the foundation of our government; that in England, the country from which we have derived our institutions, it has prevailed for hundreds of years—and, more than that, that if it had never prevailed it was high time it should be established, and that reason and justice alike demand that it should be pursued. This demonstration I deem necessary on account of the violent arraignment to which I have already referred. For what end was that arraignment? Was it intended to influence the minds of the jurors, or was it for the purpose

only of affecting the mind of the judge? Whichever it was, whatever was the design, it has so entered into the consideration of this case, that it appears to me I would be wanting in the full discharge of my duty, if I did not demonstrate that the course pursued by the judge was not only lawful and usual, but was rendered absolutely necessary by a due regard to the life, liberty and property of the citizen.

When I was practicing at the bar — and I had been practicing for nearly a quarter of a century before I came to occupy this position — I frequently experienced the inconvenience which arose from the fact that the judge would reserve his view of the case until the counsel had entirely got through with their summing up, and then by taking some novel view — something of which the counsel on neither side had thought — control the issue in the minds of the jury; and I have felt sometimes, when at the bar, that that course was calculated, if not intended, to operate injuriously on the administration of justice. It can be hardly necessary to point out to you, gentlemen, the obvious injustice to the parties engaged in the case, because they had no opportunity of knowing, and consequently no opportunity of defending themselves against the views thus presented after the counsel's mouths were closed and the parties had ceased to have aught to do except to await the judgment of the court and jury. I have frequently noticed that proceeding, and I have felt that the conduct of the judge was unjust — adverse to the rights of the parties and the due administration of justice. I have always felt, in those cases, that it was due to the parties, to justice, to candor, and frankness, that the views of the judge should be known before the mouth of the counsel was closed, and there was no opportunity left of correcting any error into which the court might fall. I determined, therefore, when I took my seat on this bench, that I never would indulge in a practice of that kind, and I never have. Whenever I have taken a view of the case; whenever the testimony and law have produced an impression affecting closely the merits of the case, I have ever felt it my duty to do as I have done

here — openly and publicly to state that view. And it has always seemed to me, and now seems to me, in spite of all that has been said, that no course could be more fair, and none less liable to exception. What? Shall a judge, having views of his own materially affecting the case, keep them concealed within his breast until the power of the party to remove these views has passed away; and shall he then pronounce them in such a manner as that they shall decide the matter? Is it possible that it can be regarded as unfair for a judge to state his views frankly, in season, when the party interested has an opportunity of correcting them if they be erroneous? Gentlemen, I do not so understand my duty as a judge. I have therefore pursued the opposite course, and I shall continue to pursue it, as one dictated by honesty and justified by the highest considerations of public justice.

Particularly is this course justifiable and proper in criminal cases. For bear in mind that there is this important distinction — and I shall have occasion directly to call your attention to the effect of that distinction — between civil and criminal cases, that in the latter the court has no authority to arrest the prosecution. In civil suits the plaintiff may be nonsuited, and the jury be discharged. That power is vested in all the courts in civil causes; it is daily exercised, and is necessary for the due administration of justice. But in criminal cases there is no such power in the court. In those cases the power to arrest the prosecution is taken away from the judge, who is supposed to be impartial, and is conferred on the district attorney, who comes into court prepared to advocate one side only. Such is the law of the land, and hence the necessity, hence the propriety, of adopting some course like that followed here, where the judge becomes convinced that a conviction would be improper. But, you will observe, the court, having no power to nonsuit, any opinion which the judge may express in regard to the propriety of a conviction, must, of necessity, be advisory only. It is advisory to whom? The public prosecutor. He alone has the power to enter a *nolle prosequi*. He alone has the

power to arrest the trial; and this opinion of the judge is, therefore, only advisory. The public prosecutor may follow or disregard it, as he pleases. In this case, that officer has seen fit to disregard the advice, and however unusual such a course may be — and you will find before we get through that it is quite unusual — it is in his power to disregard the advice; and, if he do so, it is not in your power, nor in mine, to find any fault with the decision which he makes. Upon him rests the responsibility. In his heart and conscience is the decision; and with the motives of the decision, neither you nor I have anything to do.

But this proceeding being, as I deem, usual and sustained by precedent, and having been merely the advisory expression of the opinion of the judge, has not been so understood in the progress of this case. It has been — if, at all events, I may judge from the manner in which it has been represented to you by the counsel — regarded as an authoritative, arbitrary, and tyrannical exercise of power on the part of the court. Much of the time spent in addressing you by the counsel was occupied in a vindication of the right of the jury to pass upon the question, and the danger of attempts on the part of the court to deprive them of that right. It has been represented, at one moment, as if this had been an exercise of the "one man power," exceedingly alarming, exceedingly dangerous, and that public officers were called upon to enter their solemn protest against it. Why, gentlemen, so far as the judge stands here, alone, it is not his fault. The Constitution of the land has said that he shall so stand. It has given him, no associates — no person to sit, with whom he can advise, none with whom to share responsibility.

It has also been represented to you, gentlemen — doubtless in the honest belief that such really was the case — that the whole matter here was one purely of fact. It is unquestionably true, as has been asserted here, and I have not heard the proposition questioned, that the jury are the exclusive judges of the facts of a case. I am not aware that any thing has occurred in the whole progress of this trial that has, in the

slightest degree, afforded an excuse for the supposition that that principle had been impugned, either from the bar or the bench. And this case has, therefore, been represented to you as one consisting solely of facts, of which you were the exclusive judges, and with which the court has nothing whatever to do; and on that ground you have been called upon to disregard any admonitions which might fall from the bench on this occasion. For that reason, as it is avowed, you have been taught to believe that it was improper for the court to express any opinion in regard to it.

Now, gentlemen, I do not understand that this case is one purely of fact. It is one compounded of law and fact, and it is my duty to present the law to you, and your duty to follow the law as thus propounded. You are to judge of the facts, and that in obedience to the rules of the law as laid down by me.

But there is another view in reference to the duty of the court in criminal cases, that grows out of the respective powers of the court and the public prosecutor. It is this: In civil cases, as I have said, the court has the power to arrest the progress of the cause, and nonsuit the plaintiff; and that power does not exist in criminal cases, but is vested in the district attorney alone, as you have heard him announce here. He alone can take the initiative on any such occasion. Now this presents an extraordinary state of things, and renders it necessary that in all criminal prosecutions some course should be taken by which the parties put upon their trial may have the benefit of the judgment of the court, as they can in civil cases. And what is, therefore, extraordinary in criminal cases is this, that from the time the defendant is first complained of, until finally put upon his trial before the court and jury, every officer, subordinate and intermediate though he may be, has a right to arrest the prosecution and discharge the prisoner, except the judge before whom he is ultimately to be tried. The complaint is entered before a justice of the peace, or a police magistrate, either of whom may dismiss the case and say there is nothing in it. When before the grand jury, again, the

complaint may be dismissed. That body may unquestionably say—"We dismiss this complaint; this matter shall go no farther." But when it comes finally to the court to be tried, in criminal cases, unlike civil cases, however clear may be the impropriety of conviction, however clear the view of the propriety of an acquittal, this court has no power to arrest the prosecution or discharge the defendant. Unlike any other case, then, known to our law, when the party in a criminal case is put upon his trial, he is deprived of the protection of the court, and the power of protection is conferred upon the public prosecutor. The power to arrest the trial is taken from the judge, who is supposed to stand impartially between the parties, and is conferred on him who comes merely to represent one side of the case.

This is an anomaly in the proceedings of our courts of justice, but it is nevertheless the law. It grew out of the strong desire to convict—to control the criminal prosecution. It came to us as part of our inheritance from that land whence we have derived our laws and language. It comes to us from that land where the power to arrest a criminal prosecution is reserved to the government alone. Unlike all other cases, the power is taken from him who sets as a judge, and conferred on him who stands only as an advocate. This is indeed anomalous, and out of this state of things — the power claimed by the crown descending to the prosecuting officer — has grown up here the practice, honored, because in favor of life and liberty, which has been now pursued, the practice of the courts interfering to advise the public prosecutor that the prosecution cannot be sustained. That is all which the court can do; it is all the power reserved to it. It was invented as a means of getting at the same thing by indirection, denied by direction, for the purpose of affording to parties in criminal cases the same benefit which is accorded them in civil cases. This practice, in England and in this country, has become so strongly incorporated with the administration of justice by the courts in both countries, that it is almost unprecedented in the public prosecutor to refuse to

The People v. Levi Harris.

take the advice of the court. I have never heard in this country of any instance of such a refusal, except one. In England I have not heard of a single case. The exception in this country, to which I have just alluded, occurred in this very State, where, in defiance of the court and district attorney, the counsel associated with the latter insisted on going to the jury, and insisted on a verdict of conviction, which was afterward set aside. This is the only instance in this country, heretofore, in which the advice of the court has been disregarded.

You see, then, gentlemen, how immense is the power conferred on the public prosecutor. You see how necessary it is that there should be somewhere some authority to control it. The district attorney has alone the right to enter the grand jury room and sit there giving his advice. The grand jury are bound to keep their own counsel. The influence which he can exercise over them, in finding a bill of indictment, is secret, unseen — cannot be resisted. He alone has the right to advise, and, if he choose, he may corruptly advise them to find a bill of indictment when it ought not to be found; and when that bill is once found, as you have been already informed, no power but that of the district attorney can arrest the indictment, however corrupt in its origin, or false in its prosecution. All that can be done in such case is what was done here. Now, how far it is proper for courts to take such a course, must be, I think, apparent to every one.

I have already remarked, gentlemen, that this has been the practice, as I understand it, for a great series of years. I propose now, as briefly as possible, to show you that it has been so. We have in this country no reports in *nisi prius* — nothing but the ephemeral publications of the day, and these very imperfect. But in England they have their *nisi prius* reports, and when I heard our proceedings denounced as aggressive and unprecedented, I took up, as the argument progressed, book after book of those used by the counsel on the trial, and sent for those which reported *nisi prius* cases, for the purpose of ascertaining whether my recol-

lection of my reading was entirely vague and erroneous, or whether I correctly recollected that such a course had been of daily occurrence; and I have now lying before me a series of cases reported in the English books, all going to show how often the courts have pursued the same course, and that not only after the prosecution had closed their testimony, but after the testimony on both sides had been given. In all these cases the court has interfered in the same manner that I did. Nay, gentlemen, not interfered merely by advising the prosecution to cease, but interfered so far as authoritatively to direct the jury to find a verdict of acquittal — authoritatively directing, in other cases, a verdict of conviction.

But before I refer you particularly to those authorities, I beg to call your attention to the remarks of the counsel in regard to the province of the jury to judge of the law as well as of the facts.

I confess I was astonished to hear counsel who claim to be learned in the law, announce such a proposition. It is true in only one single case, and that is where, by the Constitution, in indictments for libel, the jury have a right to determine the law and the fact. In all other cases, criminal and civil, the line of demarkation between the province of the jury and the duty of the court is well settled and clearly marked. The court is charged with the general conduct of the proceedings, it determines all questions of law and practice, pronounces on the admission or rejection of evidence, and when the case is ripe for adjudication sums it up to the jury, explaining the questions in dispute, with the law as bearing upon them. And as the proceedings of tribunals of justice ought to be based on legal evidence, and legal questions are the proper province of the court, it follows that it must be for the court to determine whether, taking all the evidence given to be true, the jury can legally act upon it, and if not, then to withdraw the case from their consideration.

This rule is so well settled, its necessity is so apparent, and the principles on which it is founded are so manifestly just,

that it would seem as if the judge who could depart from it must be either weak, corrupt, or profoundly ignorant.

The circuit judge then referred to a number of reported cases, and proceeded:

In those cases, gentlemen, to which I have called your attention — and there are many others to be met with in the books — you perceive that it has been the uniform and almost every-day practice of the judges of the English courts to arrest a trial, to advise an acquittal, in some cases to direct a conviction according to their view of the facts and law; sometimes, I have already remarked, after the testimony on both sides had been given, sometimes before. In one of these cases Campbell (then attorney-general, and afterward elevated to a high position, and now sitting in the house of lords) said that the court had directed the arrest of the case, and in declaring the assent of the public prosecutor, expressed the hope that it would ever be so. He saw and felt the necessity of such a course on the part of the court in such cases, in order to protect the life and liberty of the people.

For the reason already stated — the want of *nisi prius* reports in this country — it is not so easy to exhibit to you the practice of our courts in this particular. But I may remark that it is not the first time I have taken this course during the two years I have been on the bench, but it is the first time that any fault has been found with the procedure. When practicing at the bar I frequently saw the same course taken. As was remarked, in the palmy days of our judiciary, under our former Constitution, it was a frequent occurrence. In Sumner's Reports you will find a case in which Judge STORY — and I refer to it because the book was in court and at hand — did the same thing. He interfered to arrest the trial and to advise acquittal.

In reference to this matter I have consulted my brothers of the Supreme Court, now sitting in bank. They approve of my course. They state that they never before heard such a procedure questioned. They state that it is the first instance in which they have known the advice of the court to be disre-

garded. I may add that I have also received a message from Governor Van Ness, informing me that when he was Chief Justice of Vermont he peremptorily arrested a prosecution. He was much found fault with at the time, but on consulting afterward with eminent members of the bar, he discovered that their opinions entirely coincided with his own in regard to the propriety of his procedure in the case. Chief Justice PARSONS, long known in Massachusetts as a luminary of the law, followed the same course in a case of trial for murder.

This course, then, has been in accordance with the practice of the English courts as well as of our own. It is commended by reason and justice, and is stamped with the approbation of eminent jurists. If the court cannot exercise this discretion, if the judge cannot pursue such a course, mark how difficult would be the administration of the law! For instance, it has now become a well established rule that in cases of murder there shall be no conviction unless there have been satisfactory evidence of what is called the *corpus delicti* — that is, that a murder has actually been committed. Cases are on record in which, from neglect of this rule, the innocent have been sacrificed. Hence the courts have adopted the rule that unless there be satisfactory evidence of the *corpus delicti*, the prisoner must not be convicted, whatever may be the suspicious circumstances against him. How is this to be done? Shall a man be subjected to the hazard of conviction when the law expressly declares he shall not be convicted? The court can exercise the power and apply the beneficial rule only by advising the public prosecutor not to proceed.

So, also, in regard to the possession of stolen property. It is sometimes declared that the person in whose possession the property is found is the thief. But that is only when the property is "recently" found in his possession. The term "recently" is necessarily undefined, and when you come to consider whether it is recent or not, within the meaning of

the law, it can be decided by the court authoritatively in no other manner than that pursued in this case.

Now you will find that all the rules of law applicable to criminal trials can be enforced in no other manner, and inasmuch as in those cases just referred to the question is compounded of law and fact, it is the ordinary course for the court to interfere and prevent a conviction; and not only is it the ordinary course, but it is the bounden duty of the court to do so — in the language of one of the cases cited, the judge who would fail to do so would betray his trust.

Gentlemen, is it possible that the judge on the bench must be the mere cipher, which it has been said he is in this case? Is it possible that if a judge sees a case prosecuted from avarice and passion, pushed on to an extremity unjustly and improperly for the gratification of some prejudice or passion, he must remain a mere cipher on the bench, and unmoved and inactive behold the flood of prejudice and passion sweep his fellow citizen down to infamy and punishment? Is that a just view of the duty of the court? Rather, is it not the province of the court in such a case to arrest the mad career of passion and prejudice, or avarice; not for his own benefit, not for the benefit of the jury, but for the benefit of the public at large?

I have now described to you, gentlemen, the nature of the procedure complained of in this case; I have demonstrated to you the necessity and propriety of that course, not because it is to me a matter of any sort of consequence more than it is to you or any other person in this community, but because of its bearing upon the administration of justice hereafter; I have felt it to be my duty as a judge, in the exercise of the power with which I am clothed, to justify my position and course, not for my own sake, but for the sake of others. It is upon the Constitution and the law I have taken my stand, and I will not be driven from it without a struggle — a struggle, not for personal immunity, but for the conservation of the laws whose minister I am — not on my own account, but on

account of those in whose behalf I am clothed with the divine attribute of administering justice among men.

The circuit judge then proceeded to comment at large upon the law as bearing upon it.

The jury failed to agree and were discharged. The attorney-general then interfered, took the case out of the hands of the district attorney, and entered a *nolle prosequi* on the indictment.

[It will be interesting, perhaps, to the reader to learn the result of this controversy between the sister and the executors of her brother's will and residuary devisees under it. The payment of the draft was never enforced, but the will was set aside and the sister inherited her brother's estate as his heir at law. *See* the case of *Harris* v. *Clark*, 7 N. Y. Reports, 242, in the Court of Appeals.]